## COCA–COLA CO. v. SNOW CREST BEVERAGES, Inc.
### Civil Action No. 3141.

District Court, D. Massachusetts.
March 14, 1946.

982

Hugh D. McLellan, John T. Noonan, Herrick, Smith, Donald, Farley & Ketchum, and William J. Hession, all of Boston, Mass., and Pope F. Brock, of Atlanta, Ga., for plaintiff.

Arthur D. Thomson, Nutter, McClennen & Fish, and Arthur E. Whittemore, all of Boston, Mass., for defendant.

WYZANSKI, District Judge.

Fdg. 1. In this action plaintiff complains of defendant's alleged unfair competition and infringement of plaintiff's trade-mark "Coca-Cola." The complaint refers to plaintiff's registrations at the United States Patent Office, but does not specifically refer to the Massachusetts registration and does not aver that defendant has impinged on plaintiff's rights under the United States Trade-Mark Acts, compiled in 15 U.S.C.A. c. 3, § 81 et seq., or the Massachusetts Trade-Mark statute, Mass. G.L.(Ter.Ed.) c. 110, particularly §§ 7, 8.

Conc. 1. The complaint is adequate under the Rules of Civil Procedure to raise the issue of infringement of plaintiff's federal statutory as well as its common law rights in its mark. Compare Form 17 appended to Rule 84 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. It is unnecessary to consider whether the complaint is also adequate to raise the issue of infringement of plaintiff's Massachusetts statutory rights, inasmuch as the registration of a trade name in accordance with the Massachusetts trademark act does not confer any rights in addition to common law rights. Blair's Foodland v. Shuman's Foodland, 311 Mass. 172, 176, 40 N.E.2d 303.

Fdg. 2. Plaintiff is The Coca-Cola Company, a Delaware corporation. It is the owner of the trade-mark "Coca-Cola" registered in the United States Patent Office in the years 1893, 1905, 1925, 1928 (twice) and 1945, and registered in the Commonwealth of Massachusetts in the year 1919. For many years plaintiff has manufactured and sold in interstate commerce under the name of Coca-Cola a soft drink syrup and the beverage of a dark brown color made from the syrup. It has spent millions of dollars in advertising its product under the name Coca-Cola and has created a large public demand for it. In view of the admitted value of its mark there is involved in this controversy more than $3,000 exclusive of interest and costs.

Fdg. 3. Plaintiff sells Coca-Cola in two ways. It sells syrup to jobbers who resell to soda fountain operators who mix the syrup with carbonated water and dispense the combination by the glass. That method is of minor significance in this case. It also sells syrup to six so-called "parent bottlers," each having exclusive resale rights in a particular section of the United States, and these parent bottlers resell to local bottlers having franchises in their respective territories. A local bottler mixes the syrup with carbonated water, packages it in distinctive 6-ounce bottles into the glass of which has been blown the trade-mark Coca-Cola in script, and sells the bottled product to retail outlets including stores, bars, taverns and restaurants. The local bottler usually sells to the retail outlet at 80 cents per case of 24 bottles of 6 fluid ounces each. In New England the parent bottler is The New England Coca-Cola Bottling Company, and in Massachusetts one of the seven local bottlers with franchises is The Coca-Cola Bottling Company of Boston. Both of those companies are wholly owned subsidiaries of plaintiff.

Fdg. 4. In recent war-time years due to the shortage of sugar and other supplies plaintiff has been unable to fill the demand for its product. Therefore, it has resorted to a self-imposed system of rationing its product. This rationing has left a vacuum in the cola business.

Fdg. 5. Defendant is Snow Crest Beverages, Inc., a Massachusetts corporation. It manufactures and sells, and in recent years has manufactured and sold in interstate commerce (R. 479, 548, 549) under the name of "Polar Cola," a beverage of dark brown color made from a cola type of syrup and carbonated water. Defendant currently sells its product chiefly to bars and taverns in 28-ounce bottles at 85 cents per case of 12 bottles. Defendant currently calls its product "Cubola" and sells only in

Massachusetts but it intends to revive the name "Polar Cola" and to sell in interstate commerce. Before coming to a statement of the precise respects in which plaintiff claims defendant competes unfairly and infringes plaintiff's trade-mark, it is material to go back some years and recite the history of defendant's enterprise.

Fdg. 6. Shortly before 1927 Nathan Berkowitz purchased and operated an unincorporated business then known as Snow Crest Beverage Company. About 1930 (R. 419) Berkowitz made arrangements for the incorporation of the business. Thereafter Berkowitz and Edward Rachins each acquired and continues to own one-half of the corporate stock, except for qualifying shares for other directors.

Fdg. 7. From 1923 to 1929 the unincorporated Snow Crest Beverage Company manufactured only carbonated beverages containing pure fruit flavors and sold them under the name "Snow Crest" in quart or 7½-ounce sizes. Beginning with 1929 it manufactured in addition carbonated beverages containing artificial flavors and sold them under the name "Polar Cub" in quart, 12-ounce and 7½-ounce sizes. Upon incorporation, defendant took over both these lines of business. During this 1923-1929 period and subsequently, defendant has advertised the names "Snow Crest" and "Polar Cub" through the usual media and has built up for them a special association signifying products of defendant.

Fdg. 8. 1935 was the first year in which defendant produced a cola type of beverage (R. 427). Its cola type of beverage contained flavor from the cola nut blended with natural flavors, sugar, dextrose carbonated water and caramel color (Ex. 6). It called this product originally "Sno Kola" and later "Sno Cola." The product brought very little business to defendant, the sales never reaching so high a figure as 500 cases annually in the years 1935 through 1942 (R. 438, 439).

Fdg. 9. In 1937 the defendant (while not discontinuing its sales of Sno-Cola) put out the same cola product under the name first of "Polar Kola" and then of "Polar Cola" and marketed it in 7-ounce, 7½-ounce, 12-ounce and quart bottles (R. 442). For these bottles defendant used a crown displaying the name Polar Kola or Polar Cola in white block letters on a narrow red band and above the name a picture of a cub bear, which was defendant's symbol in its Polar Cub line of artificial fruit beverages. In addition, for the 12-ounce bottle defendant used a label displaying the words "Delicious," "Refreshing" and "Double Size." The adjectives "Delicious" and "Refreshing" were words which plaintiff had for many years used to describe its Coca-Cola. "Double Size" was a description which, in view of the wide market for Coca-Cola, the normal buyer of soft drinks would interpret as "double the size of a Coca-Cola bottle."

Fdg. 10. In 1940 defendant began to bottle its Polar Cola in a distinctive 28-ounce fluted bottle of the type it had previously used in marketing some of its other products, such as "Tom Collins Mixer," "Whiskey Sour Mixer" and "Big 8 Mixer." Defendant affixed to the fluted 28-ounce bottle and to the 7-ounce, 7½-ounce and 12-ounce bottles labels showing a picture of a bear in an arctic scene and displaying the words "Delicious" and "Refreshing." In addition, the label for the 7-ounce bottle shows the notation "individual size"; the label for the 12-ounce bottle, "double size"; the label for the 28-ounce bottle, "family size." All the bottles carried the type of Polar Cola crown referred to in the preceding paragraph.

Fdg. 11. By early 1943 defendant discontinued all the Polar Cola sales except those in the 28-ounce bottles. And since 1944 defendant has sold these 28-ounce bottles virtually only to the bar and tavern trade (R. 437, 470, 527). But as soon as sugar and other supplies become available defendant intends to resume its sales of bottles to retail stores (R. 485). Until 1944 each of these bottles had a Polar Cola cap and carried a label with (1) the trademark Polar Cola in large white lettering which approaches script, on a red background, (2) in small letters the name of Snow Crest Beverages as bottler, (3) in small letters a description of the contents, and (4) a prominent picture of an owl next to the slogan "Get Wise-Giant Size" (Ex. 6). Since December 1944 each of these bottles had a Cubola cap and carried a label which (1) emphasizes an arctic scene, (2) has the trade-mark Polar Cub in white block letters on a blue background, (3) displays as an insert a cub bear holding a red bottle, and (4) recites the phrase "sparkling beverages," the name of defendant and a brief description of the chemical contents (Ex. 13).

Fdg. 12. The growth of defendant's enterprise having been portrayed in broad

984

strokes, it is appropriate to turn now to the details concerning the three aspects of defendant's business in which plaintiff asserts that defendant impinges on its rights. The least important is the sale of bottles of Polar Cola by defendant to retail stores which resell to ultimate consumers the same bottles of Polar Cola. More important is the sale of bottles of Polar Cola by defendant to bars, taverns, restaurants and hotels which dispense to patrons of such establishments either glasses of straight Polar Cola or glasses containing a mixture of Polar Cola and whiskey or rum. And of greatest importance is defendant's use of the name Polar Cola or Polar Kola.

Fdg. 13. The only significant testimony relating to sales by defendant to retail stores covers transactions which occurred at defendant's factory in 1944 and on an earlier occasion in November 1940.

Fdg. 14. In the summer of 1944 plaintiff engaged investigators including two personable college students, one named Merlin Bernard Monsalvatge, Jr. whose appearance fully justifies his romantic name, the other a much publicized Southern football athlete named Charles Furchgott. Albert Anderson, plaintiff's director of field investigations, instructed them to proceed to the North Shore of Boston. With the aid of introductions from local representatives of plaintiff, they were permitted by a Swampscott concern known as Jack's Variety and Spa (R. 108) to pose as employees of Jack's. In the past Jack's had done business with defendant (R. 193, 202).

Fdg. 15. Shortly after going to Jack's, Furchgott telephoned defendant's factory and stated that he was at Jack's, that the store was short of products and that it would like some of defendant's products (R. 196, 197). Two weeks later, on August 15, 1944, Furchgott telephoned again, referred to his earlier call and said he was coming over about his order (R. 196, 199, 200). That same day Furchgott and Monsalvatge went in person to defendant's premises. They observed signs indicating that the place was the bottling plant of "Snow Crest Beverages"; they saw no reference by sign or otherwise to Coca-Cola (R. 105, 106). They introduced themselves as boys who worked at Jack's (R. 107, 109). With Southern charm and affability they learned that the girl who waited upon them was called "Thelma" (R. 209). From the start there was constant pleasant and inoffensive banter between the young personnel employed by plaintiff and the young personnel employed by defendant. Indeed, at later meetings they conversed not only about hurricanes and earthquakes, Southern accents and college sports but even engagements to and pictures of young ladies far south of Lynn, Salem and Swampscott (R. 124, 125, 202, 203).

Fdg. 16. On this first visit on August 14, Monsalvatge asked Thelma to make out a "ticket" for 5 cases of soft drinks (R. 204). Then chivalrously he went into the back room to pick out his own cases (R. 204-207). He deliberately, without suggestion from Thelma and without her even mentioning any kind of "cola" (R. 211), selected for himself one case of Polar Cola and four cases of other soft drinks (R. 204-207). Then he told Thelma what he had selected, and she said she would have to make out a new sales slip because the Polar Cola was more expensive (R. 208). She did make out the new ticket (Ex. 60, R. 111) and Monsalvatge went away with what he had chosen from the back room (R. 105).

Fdg. 17. August 17, 1944, Monsalvatge returned and was greeted by a girl named "Ruth" (R. 114, 125). He ordered "coke," but none was available (R. 113, 114).

Fdg. 18. August 18, 1944, Monsalvatge together with a third investigator, Joseph C. Cohen (R. 113), visited defendant's plant and saw Ruth (R. 114) and Thelma (R. 210). Monsalvatge ordered cases of orange, pale dry, root beer and "coke" (R. 114). He received a case of Polar Cola as well as other soft drinks (Ex. 62, R. 115-117).

Fdg. 19. August 28 Monsalvatge and Cohen came again to defendant's premises. They were mindful that before they had left for New England they had received instructions to give orders on two occasions for "coke" before they ordered "coca-cola" (R. 195). The first part of the instructions having been fulfilled, they proceeded to ask Ruth for "Coca-Cola." She gave them "Polar Cola" (R. 117, 118). The same pattern was repeated on September 5 when in the presence of Thelma, Ruth and a girl known as Edna (R. 125) Monsalvatge ordered a case of "Coca-Cola" and received a case of Polar Cola (R. 127, 128). At no time did Monsalvatge make any complaint of failure to receive what he had ordered (R. 128).

Fdg. 20. This recital of the North Shore adventures of the Southern cavaliers who conducted their business with at least as much adolescent romance (R. 203) and

college humor (R. 124) as precise terminology leads to this ultimate finding of fact: Defendant's agents believed and were justified in believing that when on August 28, September 5 and September 14 plaintiff's investigators asked for "Coca-Cola" they for reasons peculiar to themselves meant not Coca-Cola but Polar Cola. Any reasonable person in the position of Thelma, Ruth and Edna would have supposed that Monsalvatge on August 28, September 5 and September 14 was asking for the product which he had without assistance selected from the back room on August 15, which he had without complaint accepted on August 18 when he ordered "coke," which his ostensible employer, Jack's, had been buying for years past, and which was the sort of product that a normal customer would expect to get from a factory building which was obviously not a Coca-Cola bottling plant.

■ Conc. 2. There is in these 1944 purchases at defendant's plant no basis for plaintiff's complaint of unfair competition, violation of trade-mark or other wrong. This conclusion, like all those which follow, is based upon the federal and Massachusetts trade-mark statutes and principles of common law. The parties have agreed and this Court has previously held in National Fruit Product Co. v. Dwinell-Wright Co., D.C.Mass., 47 F.Supp. 499, that on the particular types of issues here involved there is no difference in the federal statutory rule, the federal common law rule, the Massachusetts statutory rule and the Massachusetts common law rule. It is unnecessary to restate the reasoning developed at length in the case just cited to show that no difference exists among the four rules.

Fdg. 21. Nor is there basis for complaint in the sale made at defendant's plant by defendant's agent on November 18, 1940 to Walter Theodore Vetter. Vetter's deposition shows he ordered "a case of Coke" (Dep. 4) and received a case of bottles of Polar Cola and Polar Kola (Dep. 5, 11). In view of the parties' second stipulation in the case at bar, there is no occasion for finding as to whether the word "Coke" ordinarily means "Coca-Cola."

Conc. 3. There is no foundation for claiming that the sale of November 18, 1940, involved unfair competition or infringement of a trade-mark.

■■ Fdg. 22. On another ground independent of the reasoning heretofore set forth, plaintiff fails to show any tortious conduct in defendant's sales of bottles to retail stores which merely resell those bottles to ultimate consumers. Defendant's Polar Cola, so long as it remains in the bottle, is unmistakably marked as defendant's product by a distinctive fluted type of bottle, by an individualized form of label, by plain reference to the name of the manufacturer and by a name which at least when read is not susceptible of identification with Coca-Cola. Even a purchaser of a Polar Cola bottle who was not alert could not reasonably assume that defendant's bottled goods came from plaintiff.

Conc. 4. So far as plaintiff's case rests on defendant's sales to retail stores it fails on the ground that it comes within the rule that where the ordinary purchaser buying with ordinary caution would not take defendant's goods as coming from the same source as plaintiff's, plaintiff is not entitled to regard defendant as competing unfairly or infringing plaintiff's mark. McLean v. Fleming, 96 U.S. 245, 251, 24 L.Ed. 828; Dwinell-Wright Co. v. National Fruit Product Co., 1 Cir., 140 F.2d 618, 622, 623; Glenmore Distilleries Co. v. National Distillers Product Corp., 4 Cir., 101 F.2d 479; Gilman v. Hunnewell, 122 Mass. 139, 148, last paragraph. Compare Am.L.Inst.Restatement, Torts, § 728 comment (a), § 729.

■ Conc. 5(a). The mere fact that defendant derives benefit from the good will and the merchandising efforts of plaintiff does not entitle plaintiff to relief under principles of statutory trade-mark infringement or principles of unfair competition embodied either in the non-statutory law of Massachusetts or in the non-statutory law developed by federal courts. Triangle Publications v. New England Newspaper Pub. Co., D.C.Mass., 46 F.Supp. 198, 203; New Method Die & Cut-Out Co. v. Milton Bradley Co., 289 Mass. 277, 283, 194 N.E. 80. If no one is confused and no business is diverted from plaintiff, it is not tortious if defendant "reaps where it has not sown" (Plaintiff's Brief, 68).

Fdg. 23. A more important aspect of this case is whether plaintiff may justifiably complain of defendant's sales of the 28-ounce bottles of Polar Cola to bars, taverns, hotels and the like. These outlets are hereafter sometimes called by the general description "bars."

Fdg. 24. Prior to 1940 defendant had sold to the bar and tavern trade a small amount of ginger ale but no cola type of drink. In July 1940 Edward Rachins (one of the two principal shareholders and the president of defendant) proposed a new

merchandising scheme to the officers of the Ben-Burk Company, distributors of various kinds of alcoholic drinks, including rum and whiskey. Rachins suggested that defendant and Ben-Burk Company should jointly offer to owners of bars an opportunity to buy a case of rum and get five cases of Polar Cola free (R. 445). At the time Rachins knew that it was the custom in the bar and tavern trade to mix drinks at the bar and not at the table, and that the customer ordinarily did not see the cola bottle used for mixed cola drinks.

Fdg. 25. Pursuant to Rachins' suggestion, Ben-Burk Company and defendant put the plan into effect. After Rachins had held a meeting of defendant's salesmen to promote the plan (R. 450, 451) defendant mailed to some 2200 bars in Boston a circular stating in part that "The head bartender at the Beach Comber Club in Boston says: 'My customers now drink more Cuba Libres [i.e. drinks mixed from rum and a cola type beverage (R. 446, 447)] because Polar Cola is less sweet and makes a better Cuba Libre than other Colas'" (R. 473). As a result of this and other solicitation, within two weeks 244 bars (including taverns, night clubs, hotels and like places where alcohol is drunk on the premises) became customers of defendant's Polar Cola (R. 448). By 1945 the number grew to 300.

Fdg. 26. At the time the solicitation was made (as well as at the time of the trial) these were the prices of various cola type drinks:

On the whole, defendant did little to create with respect to Polar Cola favorable consumer attitude.

Fdg. 28. January 23, 1941, counsel for plaintiff wrote defendant that in their opinion "Polar Kola" was an infringement of the trade-mark "Coca-Cola." They did not specifically complain of substitution of Polar Kola for Coca-Cola in the bar and tavern trade. Defendant did not reply.

Fdg. 29. February 6, 1942, Rachins addressed to defendant's salesmen a memorandum (Ex. P) which informed the salesmen that investigators were calling on bottlers and fountain dispensers [not bars] and asking to be sold Coca-Cola or Coke. The memorandum advised the salesmen that "The Cola you sell should only be sold under its own brand name and never as a substitute for any other product." Nothing was said about cautioning bars not to sell Polar Cola as Coca-Cola or about not selling to bars where Polar Cola was substituted for Coca-Cola by the bartender. Rachins never received or sought from his salesmen any comment on this memorandum (R. 506).

Fdg. 30. From 1943 through 1945 plaintiff undertook a systematic investigation of bars in the Greater Boston Area to determine whether upon receiving specific orders for Coca-Cola bars were supplying defendant's product (Exhibits 63-69). The investigators visited 82 separate establishments which they selected on the basis of reports that passing off was occurring there

| Name | Bottles per case | Case Price | Ounces per case | Mills per ounce |
|---|---|---|---|---|
| Coca-Cola | 24 — 6 oz. | $ .80 | 144 | 555 |
| Spur Cola | 24 — 7 oz. | .90 | 168 | 536 |
| Walkcola | 24 — 7 oz. | .75 | 168 | 446 |
| Royal Crown | 24 — 12 oz. | .80 | 288 | 278 |
| Pepsi-Cola | 24 — 12 oz. | .80 | 288 | 278 |
| Spur Cola | 28 — 12 oz. | .90 | 336 | 268 |
| Spur Cola | 12 — 28 oz. | .90 | 336 | 268 |
| Lime Cola | 12 — 28 oz. | .90 | 336 | 268 |
| Walkcola | 12 — 32 oz. | 1.00 | 384 | 260 |
| Polar Cola | 12 — 28 oz. | .85 | 336 | 253 |
| Abeco Cola | 12 — 28 oz. | .80 | 336 | 238 |
| Sea Breeze Cola | 12 — 32 oz. | .90 | 384 | 234 |
| Castle Rock Cola | 12 — 32 oz. | .80 | 384 | 208 |

Fdg. 27. Defendant furnished some of the bars with small bar cards (R. 445) and small electric signs (R. 474, 475). But the total expenditures amounted to only a few thousand dollars (R. 465-467) and there was no advertising after 1941 (R. 525).

(R. 391). Of the 82, 47 on one or more occasions served defendant's product in response to specific orders for Coca-Cola (R. 395). In the remaining 35 establishments the bartenders responded to 201 specific orders for Coca-Cola by serving Royal

Crown Cola 31 times, Castle Rock Beverages 28 times, Pepsi-Cola 25 times, Coca-Cola 24 times, and miscellaneous brands 93 times.

Fdg. 31. In September 1944 plaintiff's counsel, Mr. Brock, and defendant's president, Mr. Rachins, met at the Copley-Plaza Hotel in Boston. The conversation covered a wide range. Counsel seems to have complained of (1) the similarity between defendant's mark "Polar Cola" and plaintiff's mark "Coca-Cola"; (2) defendant's sales of Polar Cola to retail stores and retail dealers; (3) defendant's practice in supplying bars which served defendant's product when customers placed a general order for "rum (or whiskey) and cola"; and (4) defendant's practice in supplying bars which served defendant's product when customers placed a specific order for "rum (or whiskey) and Coca-Cola" (R. 480, 522, 543). Plaintiff's counsel did not place any special emphasis on the fourth point. He did not give the names or the number of any offending bars. He did not inform defendant of the details of the investigation of the 82 bars. He did not ask defendant to take any specific step to notify or caution bars against passing off.

Fdg. 32. From this conversation Rachins justifiably concluded that plaintiff was principally interested in having defendant stop using the name Polar Cola or any other name with Cola in it. He did not have the impression plaintiff was primarily interested in having defendant stop selling certain unreliable bars defendant's type of cola drink for fear that that bar would pass it off when a customer specifically ordered Coca-Cola. Having that justifiable view of plaintiff's complaint, defendant took no curative measures except that beginning in December 1944 defendant sold its product under the name Cubola. At the same time defendant continued to use Polar Cola signs on some trucks and to fill any retail orders for Polar Cola. Defendant found that there was no reduction in the volume of its sales after the change (R. 482).

Fdg. 33. From the foregoing facts, this Court finds these as ultimate facts:

(a) When defendant began to sell its product to bars it knew that the bars were selling to customers mixed drinks consisting of a cola and either rum or whiskey.

(b) Defendant at that time had no reason to know, and it is not satisfactorily proved by bartenders or others having expert knowledge that customers usually ordered such mixed drinks by naming the particular brand of cola desired (R. 486). Upon the evidence it appears that one group of customers would merely order a "Cuba Libre" or "rum (or whiskey) and cola (or coke)," and that another group of customers would specifically order "rum (or whiskey) and Coca-Cola." The latter group was not shown to be large. The call for a cola by its brand name is probably less usual than the call for a whiskey or a rum by its brand name (R. 488, 489).

(c) At the time defendant began to sell its product to bars it had no evidence that when some bars received specific orders for alcohol and Coca-Cola they substituted another type of cola.

(d) Defendant did not at any time suggest to bars that they should make a substitution when they received a specific order (R. 452). However, defendant suggested that its product was less expensive than some competing products, including plaintiff's.

(e) Defendant's sales talk, slogans and advertising campaign, its price policy, its form of packaging, the color and flavor of its product, and its trade-name Polar Cola, were designed to and did induce and encourage bars when they received a mere order for a Cuba Libre or for rum (or whiskey) and cola to serve rum (or whiskey) with defendant's product.

(f) Defendant's sales talk, slogans and advertising campaign, its price policy, its form of packaging, the color and flavor of its product, and its trade name Polar Cola were not designed to induce and did not encourage bars to make a substitution on a specific order for Coca-Cola. Where the bartender wanted to make a substitution, he could and did make it equally with any type of inexpensive cola drink no matter how named or packaged. The name Polar Cola did not facilitate the substitution because so far as appears that name was never mentioned by barkeeper or customer. The packaging of Polar Cola was so obviously different from that of Coca-Cola that it did not aid a substitution.

(g) Bars responded to defendant's product chiefly because of its price differential and because of the shortage of Coca-Cola. There was nothing in the bars' response to indicate that they would use defendant's product to fill customers' specific

Coca-Cola orders as distinguished from customers' general Cola orders. A normal bottler would attribute the large response by bars to the low price of defendant's product, the shortage of other colas, and the habit of most bar customers in ordering mixed cola drinks not to specify the desired brand of cola.

(h) In purchasing defendant's product the bars were not misled, but received exactly what they bargained for, without the slightest confusion as to the source of the goods.

(i) In September 1944 defendant learned from plaintiff's counsel his advocate's opinion, unsupported by specific citation, that when bars received specific orders for rum (or whiskey) and Coca-Cola, bars frequently substituted defendant's product. Plaintiff's counsel did not inform defendant which bars and taverns made these substitutions. This was the first time defendant knew of any such substitution on specific orders (R. 503). Defendant might have discovered some such substitutions earlier had it made a thorough investigation, but prior to September 1944 defendant had not in fact received from any source any intimation of the substitution of its product when customers placed specific Coca-Cola orders at the bars.

(j) After the September 1944 conference with plaintiff's counsel, defendant merely changed the package and name of its cola. It did not take up the issue of substitution with any of the bars or taverns to which it sold. It did not take additional steps to notify or caution its salesmen. It continued to sell a cola drink to bars and taverns without inquiring whether that particular bar or tavern was passing off a substitute when the customer specifically ordered rum (or whiskey) and Coca-Cola.

Fdg. 34. Upon these facts, the legal questions with respect to defendant's sales to bars reduce themselves to these:

(a) Was defendant under a duty not to sell its product to a bar for use by that bar in filling a customer's general order for a Cuba Libre or a rum (or whiskey) and cola?

(b) Before it had notice that some bars in filling a customer's specific order for a rum (or whiskey) and Coca-Cola used a substitute cola, was defendant under a duty to investigate possible passing off, or to take steps to safeguard against such pass-ing off, or to eliminate or curtail sales of its product?

(c) After it had notice that some unnamed bars in filling a customer's order for a rum (or whiskey) and Coca-Cola used a substitute cola, was defendant under a duty to investigate such passing off, or to take steps to safeguard against such passing off, or to eliminate or curtail sales of its product?

■ Conc. 5(b). The answer to the first question is simple. On the evidence in this case there is no basis for finding that plaintiff has any trade-mark upon or any special right to the names of "Cuba Libre" (R. 447, 532) or "cola" (R. 16). So far as appears any one has a right to make or sell products under those names. Customers who ask for them are not asking for plaintiff's product. For them there cannot be confusion as to the source of the goods. In short, defendant was free to sell its own cola to a bar for use by the bar in filling a customer's general order for "Cuba Libre" or "rum (or whiskey) and cola."

Fdg. 35. In answering the second question these are the dominant facts. There is on this record a failure to prove that many bar customers ordinarily place specific orders for Coca-Cola, that a reasonable person in the bottling business would have known or that this defendant did know that a very large number of customers did make such specific orders (R. 503, 544) or that a reasonable person in the bottling business would have known or that this defendant did know that upon receiving specific orders for Coca-Cola barkeepers would be more likely than the average man to substitute for Coca-Cola a cheaper product (R. 503). So far as appears, the great majority of customers in a bar who order a drink mixed of rum or whiskey and cola do not specify the brand of the rum or the whiskey or the cola. The percentage who specify the type cola is much lower than the small percentage of drinkers who specify the type rum or whiskey they desire.

Fdg. 36. Even upon the view of the evidence most favorable to plaintiff, the testimony only shows that some customers do place specific orders for "rum (or whiskey) and Coca-Cola," that the defendant knew it, and that any man of common sense knows that in any line of business, including but not emphasizing the business of running bars and taverns, there are some

unscrupulous persons who, when it is to their financial advantage to do so, will palm off on customers a different product from that ordered by the customer (Rachius, Dep. 27).

Conc. 6. Upon these facts defendant was not under a duty to investigate possible passing off by bartenders, or to take steps to safeguard against such passing off, or to eliminate or curtail sales of its product.

Conc. 7. It is, of course, defendant's duty to avoid intentionally inducing bars to market defendant's products as products of plaintiff. Summerfield Co. v. Prime Furniture Co., 242 Mass. 149, 155, 136 N.E. 396; Am.L.Inst., Restatement, Torts § 713. It is also defendant's duty to avoid knowingly aiding bars which purchase defendant's products from marketing those products in such a manner as to infringe plaintiff's trade-mark. New England Awl & Needle Co. v. Marlborough Awl & Needle Co., 168 Mass. 154, 155, 46 N.E. 386, 60 Am.St.Rep. 377; Reid, Murdoch & Co. v. H. P. Coffee Co., 8 Cir., 48 F.2d 815, 817, 819, 820; Am.L.Inst., Restatement, Torts § 738, comment a, illustration 2.

Conc. 8. Under the principles just stated, it would have been a breach of duty if defendant's salesmen had induced bars to buy defendant's product for the stated or implied purpose of serving it when Coca-Cola was called for. It would also have been a breach of duty for defendant to have continued sales to bars without taking some precautionary measures if it had known or a normal bottler would have known that most bar customers specifically ordered Coca-Cola and that consequently a normal bottler would infer from defendant's large volume of sales that many bars which bought defendant's product were using defendant's product as a substitute in the case of specific orders of Coca-Cola and were not merely using it as an ordinary cola when a customer placed a general order for a "Cuba Libre" or a "rum (or whiskey) and cola." Likewise, it would have been a breach of duty if defendant had known that many bar customers specifically ordered Coca-Cola and had also known that some particular bars were in fact using defendant's product as a substitute in the case of specific orders for Coca-Cola.

Conc. 9. But in the case at bar plaintiff seems to urge that defendant's obligation goes further. Plaintiff appears to contend that once a defendant has knowledge that some customers of bars specifically order "rum (or whiskey) and Coca-Cola," and that there are in all probability some rouges in the bar business as in other businesses, the defendant has a duty either (a) not to sell to any bar a cola until defendant first creates for that cola a special consumer demand, or (b) at least not to sell a cola to a bar before defendant has particularly cautioned the bar to be scrupulous against substitution. The law does not go that far. Before he can himself be held as a wrongdoer or contributory infringer one who supplies another with the instruments by which that other commits a tort, must be shown to have knowledge that the other will or can reasonably be expected to commit a tort with the supplied instrument. Nugrape Co. of America v. Glazier, 5 Cir., 22 F.2d 596, 597. The test is whether wrongdoing by the purchaser "might well have been anticipated by the defendant." Reid, Murdoch & Co. v. H. P. Coffee Co., 8 Cir., 48 F.2d 817, 819, last two lines.

Conc. 10. There is no broader legal principle that always makes the defendant his brother's or his customer's keeper. Where the defendant markets a product, defendant's accountability for his customer's wrongful use of that product turns on the issue whether a reasonable person in the defendant's position would realize either that he himself had created a situation which afforded a temptation to or an opportunity for wrong by l'homme moyen sensuel or was dealing with a customer whom he should know would be peculiarly likely to use the defendant's product wrongfully. Compare Am.L.Inst., Restatement, Torts, § 302, comment m.

Conc. 11. Prior to September 1944, defendant had neither created nor knowingly taken advantage of a situation where bars served their customers defendant's product in response to specific orders for plaintiff's product.

Conc. 12. There remains the problem raised by the third question, that is, the duty of defendant after September 1944. In solving that problem the general principles applicable are not different from those reviewed in answering the second question. That is, plaintiff would have established a case against defendant if in the fall of 1944 or at any other time prior

to November 14, 1944 when this suit was brought plaintiff had given defendant either (a) credible information that would have led a normal bottler in defendant's position to believe that so many bar customers specifically ordered "rum (or whiskey) and Coca-Cola" that in view of the volume of defendant's sales many bars must necessarily be passing off defendant's product as Coca-Cola, or[h] (b) notice that particular named bars which defendant was continuing to supply were serving defendant's product when plaintiff's product was specifically ordered. New England Awl & Needle Co. v. Marlborough Awl & Needle Co., 168 Mass. 154, 155, 46 N.E. 386, 60 Am.St.Rep. 377. But the evidence shows no such proffer of information that would persuade a reasonable man and no such notice by plaintiff. Plaintiff did not go beyond stating in a conversation of general scope that unnamed bars in unnamed quantities were serving defendant's product when plaintiff's was called for. This statement was not supported by specific examples and appeared to be lawyers' argumentative talk. It was contrary to the information defendant had from other sources (R. 503) that were not inherently less reliable than statements from opposing counsel. Moreover, plaintiff's counsel did not plainly state that he recognized a legal difference between situations where the bar customer placed a specific order for "rum (or whiskey) and Coca-Cola" and situations where the bar customer placed a general order for a "Cuba Libre" or a "rum (or whiskey) and cola" (Rachins, Dep. 27, R. 541, 542). Indeed, I find that plaintiff never perceived that there a critical legal distinction existed between the two situations. [Plaintiff's Brief, p. 78(e)] Its objective in its communications was first, to get defendant to change the name Polar Cola and second, indirectly to secure a monopoly on the whole of the business of selling any type of cola to bars that serve a mixed drink composed of any kind of alcohol and any kind of cola.

Conc. 13. Neither its registered federal and state trade-marks nor its common law rights under the Massachusetts or federal principles of unfair competition sustain plaintiff's claim that after the September 1944 conference defendant was under a duty to investigate passing off or to take steps to safeguard against such passing off or to eliminate or curtail sale of its products.

Conc. 14. Nothing herein intimates any opinion on the question whether defendant, after having its attention drawn in the course of the trial of this case to testimony that particular bars have served defendant's product in response to customer's orders for plaintiff's product, is now under a duty to minimize or eliminate the risk that those or other bars will engage in a further confusion of defendant's goods with plaintiff's goods.

Fdg. 37. There remains for consideration the issue whether in the light of all the circumstances defendant's use of the brand names and trade-marks "Polar Cola" and "Polar Kola" infringe plaintiff's common law and statutory rights in the mark "Coca-Cola."

Fdg. 38. In determining this issue these factors seem to me paramount:

(a) The suffix "Cola" is now conceded to be a generic name for a type of soft drink (R. 16). The public is familiar with many different prefixes to the word "Cola"—for example, Pepsi, Dixi and Royal Crown, each of which has been held in other proceedings not to be an infringement of plaintiff's rights. Coca-Cola Company of Canada, Ltd., v. Pepsi-Cola Company of Canada, Ltd., Privy Council 1942, 32 T.M. Rep. 313; Dixi-Cola Laboratories, Inc., et al. v. Coca-Cola Co., 4 Cir., 117 F.2d 352; Coca-Cola Co. v. Nehi Corp., Del.Sup., 36 A.2d 156. The existence of these rival prefixes is of significance inasmuch as "the question whether * * * two names are so similar * * * that one is likely to be mistaken for the other by an ordinarily careful buyer, is to be determined, not merely by an inspection of the words, but by considering them in connection with other similar words in use in the same general field." Thomas Kerfoot & Co., Ltd., v. Louis K. Liggett Co., 1 Cir., 67 F. 2d 214, 215.

(b) When defendant chose the prefix "Polar" it selected a prefix not entirely new to its own business, for in connection with beverages other than colas defendant had used the trade-name "Polar Cub" and it had used the relevant symbol of a bear pictured against an arctic background.

(c) Moreover, no even moderately attentive reader who saw the mark "Polar Cola" written or printed would confuse it with "Coca-Cola," both because the initial letters

are so different and because defendant's style of printing is so different from plaintiff's (R. 5).

(d) Where defendant's product has been sold in bottles, there is no proof that consumers or others actually have been so confused as to suppose they were receiving plaintiff's product. Nor is there any sound basis for assuming in the case of sales in bottles that consumers or others theoretically could be confused. The packaging and labeling of both plaintiff and defendant are distinctive. An inspection of the bottles makes it clear that the public would distinguish them. The distinctions characteristic of plaintiff's bottle, including its shape, its size, and its impressed trademark are not simulated by defendant's bottle.

(e) Where defendant's product has been sold at bars, whether or not as part of a mixed drink, I am not persuaded that consumers or others actually had been confused by the name "Polar Cola." The bartenders and waiters who told plaintiff's investigators that they were confused (R. 5, 25, 31, 38, 42, 46, 62, 76 and 89) were, in my opinion, merely giving a false explanation for their own deliberate deception not attributable to defendants. And there is no adequate basis for assuming a theoretical confusion on the basis of the name. It is possible that when a consumer orally ordered Polar Cola a bartender or waiter might understand the order to be Coca-Cola; but it is unlikely that when a consumer ordered Coca-Cola a waiter acting in good faith would understand Polar Cola. The introductory two "c"s gives sounds entirely different from the "p" and "c." Thus there is virtually no risk that defendant's product will be accidentally passed off to a customer who has ordered plaintiff's products. There is no appreciable risk that plaintiff's product will be accidentally passed off to a customer who has ordered defendant's product and hence there is no danger that defendant will accidentally receive from consumers gustatory as distinguished from economic credit, for the peculiar qualities inherent in plaintiff's product.

Conc. 15. In the light of the foregoing considerations, defendant's use of the marks "Polar Cola" and "Polar Kola" does not infringe plaintiff's common law or statutory rights in the mark "Coca-Cola."

Decree dismissing complaint with costs.