08-3947-cv
Tiffany (NJ) Inc. v. eBay Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: July 16, 2009                    Decided: April 1, 2010)

Docket No. 08-3947-cv

---------------------------------------

TIFFANY (NJ) INC. and TIFFANY and COMPANY,

Plaintiffs-Appellants,

- v. -

eBay Inc.,

Defendant-Appellee.

---------------------------------------

Before:   SACK and B.D. PARKER, Circuit Judges, and Goldberg,
          Judge.*

Appeal from a judgment of the United States District Court for the Southern District of New York.  The district court (Richard J. Sullivan, Judge) concluded, inter alia, that eBay -- the proprietor of a website through which counterfeit Tiffany merchandise was sold -- did not, on the facts presented, engage in trademark infringement, false advertising, or trademark dilution.  We affirm the judgment with respect to Tiffany's claims of trademark infringement and dilution, but remand for further proceedings with respect to Tiffany's claim of false advertising.

---

* The Honorable Richard W. Goldberg, Senior Judge, United States Court of International Trade, sitting by designation.

JAMES B. SWIRE (H. Peter Haveles, Jr., Peter L. Zimroth, Erik C. Walsh, and Elanor M. Lackman, on the brief) Arnold & Porter LLP, New York, NY, for Plaintiffs-Appellants.

R. BRUCE RICH (Randi W. Singer, Jonathan Bloom, and Mark J. Fiore on the brief) Weil, Gotshal & Manges LLP, New York, NY, for Defendant-Appellee.

Bruce P. Keller, David H. Bernstein, Michael R. Potenza, Debevoise & Plimpton LLP, New York, NY, for Amicus Curiae The International Anticounterfeiting Coalition.

John F. Cooney, Janet F. Satterwaite, Meghan Hemmings Kend, Venable LLP, Washington, D.C., for Amicus Curiae Coty, Inc.

Alain Coblence, Coblence & Associates, New York, NY, for Amicus Curiae The Council of Fashion Designers of America, Inc.

Patric J. Carome, Samir C. Jain, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for Amici Curiae Amazon.com, Inc., Google Inc., Information Technology Association of America, Internet Commerce Coalition, Netcoalition, United States Internet Service Provider Association, and United States Telecom Association.

Meredith Martin Addy and Howard S. Michael, Brinks Hofer Gilson & Lione, Chicago, IL, David S. Fleming, Brinks Hofer Gilson & Lione, New York, NY, for Amicus Curiae Yahoo! Inc.

Fred von Lohmann, Michael Kwum, The Electronic Frontier Foundation, San Francisco, CA, for Amici Curiae The Electronic Frontier Foundation, Public Citizen, and Public Knowledge.

SACK, Circuit Judge:

eBay, Inc. ("eBay"), through its eponymous online marketplace, has revolutionized the online sale of goods, especially used goods. It has facilitated the buying and selling by hundreds of millions of people and entities, to their benefit and eBay's profit. But that marketplace is sometimes employed by users as a means to perpetrate fraud by selling counterfeit goods.

Plaintiffs Tiffany (NJ) Inc. and Tiffany and Company (together, "Tiffany") have created and cultivated a brand of jewelry bespeaking high-end quality and style. Based on Tiffany's concern that some use eBay's website to sell counterfeit Tiffany merchandise, Tiffany has instituted this action against eBay, asserting various causes of action -- sounding in trademark infringement, trademark dilution and false advertising -- arising from eBay's advertising and listing practices. For the reasons set forth below, we affirm the district court's judgment with respect to Tiffany's claims of trademark infringement and dilution but remand for further proceedings with respect to Tiffany's false advertising claim.

**BACKGROUND**

By opinion dated July 14, 2008, following a week-long bench trial, the United States District Court for the Southern District of New York (Richard J. Sullivan, Judge) set forth its findings of fact and conclusions of law. Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 463 (S.D.N.Y. 2008) ("Tiffany").

3

When reviewing a judgment following a bench trial in the district court, we review the court's findings of fact for clear error and its conclusions of law de novo. Giordano v. Thomson, 564 F.3d 163, 168 (2d Cir. 2009). Except where noted otherwise, we conclude that the district court's findings of fact are not clearly erroneous. We therefore rely upon those non-erroneous findings in setting forth the facts of, and considering, this dispute.

eBay

eBay[1] is the proprietor of www.ebay.com, an Internet-based marketplace that allows those who register with it to purchase goods from and sell goods to one another. It "connect[s] buyers and sellers and [] enable[s] transactions, which are carried out directly between eBay members." Tiffany, 576 F. Supp. 2d at 475.[2] In its auction and listing services, it "provides the venue for the sale [of goods] and support for the transaction[s], [but] it does not itself sell the items" listed for sale on the site, id. at 475, nor does it ever take physical

_____

[1] eBay appears to be short for Echo Bay -- the name of eBay's founder's consulting firm was Echo Bay Technology Group. The name "EchoBay" was already in use, so eBay was employed as the name for the website. See http://en.wikipedia.org/wiki/EBay#Origins_and_history (last visited Feb. 26, 2010); http://news.softpedia.com/news/eBay-Turns-Ten-Happy-Birthday-7502.shtml (last visited Feb. 26, 2010).

[2] In addition to providing auction-style and fixed-priced listings, eBay is also the proprietor of a traditional classified service. Id. at 474.

4

possession of them, id. Thus, "eBay generally does not know whether or when an item is delivered to the buyer." Id.

eBay has been enormously successful. More than six million new listings are posted on its site daily. Id. At any given time it contains some 100 million listings. Id.

eBay generates revenue by charging sellers to use its listing services. For any listing, it charges an "insertion fee" based on the auction's starting price for the goods being sold and ranges from $0.20 to $4.80. Id. For any completed sale, it charges a "final value fee" that ranges from 5.25% to 10% of the final sale price of the item. Id. Sellers have the option of purchasing, at additional cost, features "to differentiate their listings, such as a border or bold-faced type." Id.

eBay also generates revenue through a company named PayPal, which it owns and which allows users to process their purchases. PayPal deducts, as a fee for each transaction that it processes, 1.9% to 2.9% of the transaction amount, plus $0.30. Id. This gives eBay an added incentive to increase both the volume and the price of the goods sold on its website. Id.

Tiffany

Tiffany is a world-famous purveyor of, among other things, branded jewelry. Id. at 471-72. Since 2000, all new Tiffany jewelry sold in the United States has been available exclusively through Tiffany's retail stores, catalogs, and website, and through its Corporate Sales Department. Id. at 472-73. It does not use liquidators, sell overstock merchandise, or

5

put its goods on sale at discounted prices. Id. at 473. It does not -- nor can it, for that matter -- control the "legitimate secondary market in authentic Tiffany silvery jewelry," i.e., the market for second-hand Tiffany wares. Id. at 473. The record developed at trial "offere[d] little basis from which to discern the actual availability of authentic Tiffany silver jewelry in the secondary market." Id. at 474.

Sometime before 2004, Tiffany became aware that counterfeit Tiffany merchandise was being sold on eBay's site. Prior to and during the course of this litigation, Tiffany conducted two surveys known as "Buying Programs," one in 2004 and another in 2005, in an attempt to assess the extent of this practice. Under those programs, Tiffany bought various items on eBay and then inspected and evaluated them to determine how many were counterfeit. Id. at 485. Tiffany found that 73.1% of the purported Tiffany goods purchased in the 2004 Buying Program and 75.5% of those purchased in the 2005 Buying Program were counterfeit. Id. The district court concluded, however, that the Buying Programs were "methodologically flawed and of questionable value," id. at 512, and "provide[d] limited evidence as to the total percentage of counterfeit goods available on eBay at any given time," id. at 486. The court nonetheless decided that during the period in which the Buying Programs were in effect, a "significant portion of the 'Tiffany' sterling silver jewelry listed on the eBay website . . . was counterfeit," id., and that eBay knew "that some portion of the Tiffany goods sold

on its website might be counterfeit," id. at 507. The court found, however, that "a substantial number of authentic Tiffany goods are [also] sold on eBay." Id. at 509.

Reducing or eliminating the sale of all second-hand Tiffany goods, including genuine Tiffany pieces, through eBay's website would benefit Tiffany in at least one sense: It would diminish the competition in the market for genuine Tiffany merchandise. See id. at 510 n.36 (noting that "there is at least some basis in the record for eBay's assertion that one of Tiffany's goals in pursuing this litigation is to shut down the legitimate secondary market in authentic Tiffany goods"). The immediate effect would be loss of revenue to eBay, even though there might be a countervailing gain by eBay resulting from increased consumer confidence about the bona fides of other goods sold through its website.

Anti-Counterfeiting Measures

Because eBay facilitates many sales of Tiffany goods, genuine and otherwise, and obtains revenue on every transaction, it generates substantial revenues from the sale of purported Tiffany goods, some of which are counterfeit. "eBay's Jewelry & Watches category manager estimated that, between April 2000 and June 2004, eBay earned $4.1 million in revenue from completed listings with 'Tiffany' in the listing title in the Jewelry & Watches category." Id. at 481. Although eBay was generating revenue from all sales of goods on its site, including counterfeit goods, the district court found eBay to have "an

7

interest in eliminating counterfeit Tiffany merchandise from eBay . . . to preserve the reputation of its website as a safe place to do business." Id. at 469. The buyer of fake Tiffany goods might, if and when the forgery was detected, fault eBay. Indeed, the district court found that "buyers . . . complain[ed] to eBay" about the sale of counterfeit Tiffany goods. Id. at 487. "[D]uring the last six weeks of 2004, 125 consumers complained to eBay about purchasing 'Tiffany' items through the eBay website that they believed to be counterfeit." Id.

Because eBay "never saw or inspected the merchandise in the listings," its ability to determine whether a particular listing was for counterfeit goods was limited. Id. at 477-78. Even had it been able to inspect the goods, moreover, in many instances it likely would not have had the expertise to determine whether they were counterfeit. Id. at 472 n.7 ("[I]n many instances, determining whether an item is counterfeit will require a physical inspection of the item, and some degree of expertise on the part of the examiner.").

Notwithstanding these limitations, eBay spent "as much as $20 million each year on tools to promote trust and safety on its website." Id. at 476. For example, eBay and PayPal set up "buyer protection programs," under which, in certain circumstances, the buyer would be reimbursed for the cost of items purchased on eBay that were discovered not to be genuine. Id. at 479. eBay also established a "Trust and Safety" department, with some 4,000 employees "devoted to trust and

8

safety" issues, including over 200 who "focus exclusively on combating infringement" and 70 who "work exclusively with law enforcement." Id. at 476.

By May 2002, eBay had implemented a "fraud engine," "which is principally dedicated to ferreting out illegal listings, including counterfeit listings." Id. at 477. eBay had theretofore employed manual searches for keywords in listings in an effort to "identify blatant instances of potentially infringing ... activity." Id. "The fraud engine uses rules and complex models that automatically search for activity that violates eBay policies." Id. In addition to identifying items actually advertised as counterfeit, the engine also incorporates various filters designed to screen out less-obvious instances of counterfeiting using "data elements designed to evaluate listings based on, for example, the seller's Internet protocol address, any issues associated with the seller's account on eBay, and the feedback the seller has received from other eBay users." Id. In addition to general filters, the fraud engine incorporates "Tiffany-specific filters," including "approximately 90 different keywords" designed to help distinguish between genuine and counterfeit Tiffany goods. Id. at 491. During the period in dispute,[3] eBay also "periodically conducted [manual] reviews of

_____

[3] In its findings, the district court often used the past tense to describe eBay's anticounterfeiting efforts. We do not take this usage to suggest that eBay has discontinued these efforts, but only to emphasize that its findings are issued with respect to a particular period of time prior to the completion of trial and issuance of its decision.

9

listings in an effort to remove those that might be selling counterfeit goods, including Tiffany goods."  Id.

For nearly a decade, including the period at issue, eBay has also maintained and administered the "Verified Rights Owner ('VeRO') Program" -- a "'notice-and-takedown' system" allowing owners of intellectual property rights, including Tiffany, to "report to eBay any listing offering potentially infringing items, so that eBay could remove such reported listings."  Id. at 478.  Any such rights-holder with a "good-faith belief that [a particular listed] item infringed on a copyright or a trademark" could report the item to eBay, using a "Notice Of Claimed Infringement form or NOCI form."  Id.  During the period under consideration, eBay's practice was to remove reported listings within twenty-four hours of receiving a NOCI, but eBay in fact deleted seventy to eighty percent of them within twelve hours of notification.  Id.

On receipt of a NOCI, if the auction or sale had not ended, eBay would, in addition to removing the listing, cancel the bids and inform the seller of the reason for the cancellation.  If bidding had ended, eBay would retroactively cancel the transaction.  Id.  In the event of a cancelled auction, eBay would refund the fees it had been paid in connection with the auction.  Id. at 478-79.

In some circumstances, eBay would reimburse the buyer for the cost of a purchased item, provided the buyer presented

10

evidence that the purchased item was counterfeit.  <u>Id.</u> at 479.[4]

During the relevant time period, the district court found, eBay "never refused to remove a reported Tiffany listing, acted in good faith in responding to Tiffany's NOCIs, and always provided Tiffany with the seller's contact information."  <u>Id.</u> at 488.

In addition, eBay has allowed rights owners such as Tiffany to create an "About Me" webpage on eBay's website "to inform eBay users about their products, intellectual property rights, and legal positions."  <u>Id.</u> at 479.  eBay does not exercise control over the content of those pages in a manner material to the issues before us.

Tiffany, not eBay, maintains the Tiffany "About Me" page.  With the headline **"BUYER BEWARE,"** the page begins:  **"Most of the purported TIFFANY & CO. silver jewelry and packaging available on eBay is counterfeit."**  Pl.'s Ex. 290 (bold face type in original).  It also says, <u>inter alia</u>:

> The only way you can be certain that you are purchasing a genuine TIFFANY & CO. product is to purchase it from a Tiffany & Co. retail store, via our website (<u>www.tiffany.com</u>) or through a Tiffany & Co. catalogue.  Tiffany & Co. stores do not authenticate merchandise.  A good jeweler or appraiser may be able to do this for you.

<u>Id.</u>

---

[4]  We note, however, that, Tiffany's "About Me" page on the eBay website states that Tiffany does not authenticate merchandise.  Pl.'s Ex. 290.
Thus, it may be difficult for a purchaser to proffer evidence to eBay supporting a suspicion that the "Tiffany" merchandise he or she bought is counterfeit.

In 2003 or early 2004, eBay began to use "special warning messages when a seller attempted to list a Tiffany item." Tiffany, 576 F. Supp. 2d at 491. These messages "instructed the seller to make sure that the item was authentic Tiffany merchandise and informed the seller that eBay 'does not tolerate the listing of replica, counterfeit, or otherwise unauthorized items' and that violation of this policy 'could result in suspension of [the seller's] account.'" Id. (alteration in original). The messages also provided a link to Tiffany's "About Me" page with its "buyer beware" disclaimer. Id. If the seller "continued to list an item despite the warning, the listing was flagged for review." Id.

In addition to cancelling particular suspicious transactions, eBay has also suspended from its website "'hundreds of thousands of sellers every year,' tens of thousands of whom were suspected [of] having engaged in infringing conduct." Id. at 489. eBay primarily employed a "'three strikes rule'" for suspensions, but would suspend sellers after the first violation if it was clear that "the seller 'listed a number of infringing items,' and '[selling counterfeit merchandise] appears to be the only thing they've come to eBay to do.'" Id. But if "a seller listed a potentially infringing item but appeared overall to be a legitimate seller, the 'infringing items [were] taken down, and the seller [would] be sent a warning on the first offense and given the educational information, [and] told that . . . if they

12

do this again, they will be suspended from eBay.'" Id. (alterations in original).[5]

By late 2006, eBay had implemented additional anti-fraud measures: delaying the ability of buyers to view listings of certain brand names, including Tiffany's, for 6 to 12 hours so as to give rights-holders such as Tiffany more time to review those listings; developing the ability to assess the number of items listed in a given listing; and restricting one-day and three-day auctions and cross-border trading for some brand-name items. Id. at 492.

The district court concluded that "eBay consistently took steps to improve its technology and develop anti-fraud measures as such measures became technologically feasible and reasonably available." Id. at 493.

eBay's Advertising

At the same time that eBay was attempting to reduce the sale of counterfeit items on its website, it actively sought to promote sales of premium and branded jewelry, including Tiffany merchandise, on its site. Id. at 479-80. Among other things,

___

[5] According to the district court, "eBay took appropriate steps to warn and then to suspend sellers when eBay learned of potential trademark infringement under that seller's account." Tiffany, 576 F. Supp. 2d at 489. The district court concluded that it was understandable that eBay did not have a "hard-and-fast, one-strike rule" of suspending sellers because a NOCI "did not constitute a definitive finding that the listed item was counterfeit" and because "suspension was a very serious matter, particularly to those sellers who relied on eBay for their livelihoods." Id. The district court ultimately found eBay's policy to be "appropriate and effective in preventing sellers from returning to eBay and re-listing potentially counterfeit merchandise." Id.

eBay "advised its sellers to take advantage of the demand for Tiffany merchandise as part of a broader effort to grow the Jewelry & Watches category." Id. at 479. And prior to 2003, eBay advertised the availability of Tiffany merchandise on its site. eBay's advertisements trumpeted "Mother's Day Gifts!," Pl.'s Exs. 392, 1064, a "Fall FASHION BRAND BLOWOUT," Pl.'s Ex. 392, "Jewelry Best Sellers," id., "GREAT BRANDS, GREAT PRICES," Pl.'s Ex. 1064, or "Top Valentine's Deals," Pl.'s Ex. 392, among other promotions. It encouraged the viewer to "GET THE FINER THINGS." Pl.'s Ex. 392. These advertisements provided the reader with hyperlinks, at least one of each of which was related to Tiffany merchandise -- "Tiffany," "Tiffany & Co. under $150," "Tiffany & Co," "Tiffany Rings," or "Tiffany & Co. under $50." Pl.'s Exs. 392, 1064.

eBay also purchased sponsored-link advertisements on various search engines to promote the availability of Tiffany items on its website. Tiffany, 576 F. Supp. 2d at 480. In one such case, in the form of a printout of the results list from a search on Yahoo! for "tiffany," the second sponsored link read "**Tiffany** on eBay. Find **tiffany** items at low prices. With over 5 million items for sale every day, you'll find all kinds of unique [unreadable] Marketplace. www.ebay.com." Pl.'s Ex. 1065 (bold face type in original). Tiffany complained to eBay of the practice in 2003, and eBay told Tiffany that it had ceased buying sponsored links. Tiffany, 576 F. Supp. 2d at 480. The district

14

court found, however, that eBay continued to do so indirectly through a third party. Id.

Procedural History

By amended complaint dated July 15, 2004, Tiffany initiated this action. It alleged, inter alia, that eBay's conduct -- i.e., facilitating and advertising the sale of "Tiffany" goods that turned out to be counterfeit -- constituted direct and contributory trademark infringement, trademark dilution, and false advertising. On July 14, 2008, following a bench trial, the district court, in a thorough and thoughtful opinion, set forth its findings of fact and conclusions of law, deciding in favor of eBay on all claims.

Tiffany appeals from the district court's judgment for eBay.

**DISCUSSION**

We review the district court's findings of fact for clear error and its conclusions of law de novo. Giordano v. Thomson, 564 F.3d 163, 168 (2d Cir. 2009).

I. Direct Trademark Infringement

Tiffany alleges that eBay infringed its trademark in violation of section 32 of the Lanham Act.[6] The district court

---

[6] That section states in pertinent part:

Any person who shall, without the consent of the registrant -- (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such

described this as a claim of "direct trademark infringement," Tiffany, 576 F. Supp. 2d at 493, and we adopt that terminology. Under section 32, "the owner of a mark registered with the Patent and Trademark Office can bring a civil action against a person alleged to have used the mark without the owner's consent." ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 145-46 (2d Cir.), cert. denied, 552 U.S. 827 (2007).  We analyze such a claim "under a familiar two-prong test.  The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether the defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods."  Savin Corp. v. Savin Group, 391 F.3d 439, 456 (2d Cir. 2004) (alterations incorporated and ellipses omitted), cert. denied, 546 U.S. 822 (2005).

In the district court, Tiffany argued that eBay had directly infringed its mark by using it on eBay's website and by purchasing sponsored links containing the mark on Google and Yahoo!  Tiffany, 576 F. Supp. 2d at 494.  Tiffany also argued that eBay and the sellers of the counterfeit goods using its site were jointly and severally liable.  Id.  The district court

use is likely to cause confusion, or to cause
mistake, or to deceive; . . . shall be liable
in a civil action by the registrant for the
remedies hereinafter provided.

15 U.S.C. § 1114(1)(a).  Tiffany's complaint asserts causes of action under both the Lanham Act and New York State common law. The claims are composed of the same elements.  We therefore analyze them together.  See, e.g., Standard & Poor's Corp. v. Commodity Exch., Inc., 683 F.2d 704, 708 (2d Cir. 1982).

16

rejected these arguments on the ground that eBay's use of Tiffany's mark was protected by the doctrine of nominative fair use. Id. at 494-95.

The doctrine of nominative fair use allows "[a] defendant [to] use a plaintiff's trademark to identify the plaintiff's goods so long as there is no likelihood of confusion about the source of [the] defendant's product or the mark-holder's sponsorship or affiliation." Merck & Co. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402, 413 (S.D.N.Y. 2006). The doctrine apparently originated in the Court of Appeals for the Ninth Circuit. See New Kids on the Block v. News Am. Publ'g, Inc., 971 F.2d 302 (9th Cir. 1992). To fall within the protection, according to that court: "First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." Id. at 308.

The Court of Appeals for the Third Circuit has endorsed these principles. See Century 21 Real Estate Corp. v. Lendingtree, Inc., 425 F.3d 211, 222 (3d Cir. 2005).[7] We have

---

[7] The Third Circuit treats the doctrine as an affirmative defense, see Century 21, 425 F.3d at 217-32, while the Ninth Circuit views the doctrine as a modification to the likelihood-of-confusion analysis of the plaintiff's underlying infringement claim, see Playboy Enters. v. Welles, 279 F.3d 796, 801 (9th Cir. 2002).

17

referred to the doctrine, albeit without adopting or rejecting it.  See, e.g., Chambers v. Time Warner, Inc., 282 F.3d 147, 156 (2d Cir. 2002) (noting that the district court had "[a]ppl[ied] the standard for non-trademark or 'nominative' fair use set forth by the Ninth Circuit").  Other circuits have done similarly. See, e.g., Univ. Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 424 (1st Cir. 2007); Pebble Beach Co. v. Tour 18 I Ltd., 155 F.3d 526, 547 (5th Cir. 1998), abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23 (2001).

We need not address the viability of the doctrine to resolve Tiffany's claim, however.  We have recognized that a defendant may lawfully use a plaintiff's trademark where doing so is necessary to describe the plaintiff's product and does not imply a false affiliation or endorsement by the plaintiff of the defendant.  "While a trademark conveys an exclusive right to the use of a mark in commerce in the area reserved, that right generally does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the product."  Dow Jones & Co. v. Int'l Sec. Exch., Inc., 451 F.3d 295, 308 (2d Cir. 2006); see also Polymer Tech. Corp. V. Mimran, 975 F.2d 58, 61-62 (2d Cir. 1992) ("As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner" (footnote omitted)); cf. Prestonettes, Inc. v. Coty, 264 U.S. 359, 368 (1924) (when a "mark is used in a way that does

18

not deceive the public," there is "no such sanctity in the word as to prevent its being used to tell the truth.  It is not taboo.").

We agree with the district court that eBay's use of Tiffany's mark on its website and in sponsored links was lawful. eBay used the mark to describe accurately the genuine Tiffany goods offered for sale on its website.  And none of eBay's uses of the mark suggested that Tiffany affiliated itself with eBay or endorsed the sale of its products through eBay's website.

In addition, the "About Me" page that Tiffany has maintained on eBay's website since 2004 states that "[m]ost of the purported 'TIFFANY & CO.' silver jewelry and packaging available on eBay is counterfeit."  Tiffany, 576 F. Supp. 2d at 479 (internal quotation marks omitted).  The page further explained that Tiffany itself sells its products only through its own stores, catalogues, and website.  Id.

Tiffany argues, however, that even if eBay had the right to use its mark with respect to the resale of genuine Tiffany merchandise, eBay infringed the mark because it knew or had reason to know that there was "a substantial problem with the sale of counterfeit [Tiffany] silver jewelry" on the eBay website.  Appellants' Br. 45.  As we discuss below, eBay's knowledge vel non that counterfeit Tiffany wares were offered through its website is relevant to the issue of whether eBay contributed to the direct infringement of Tiffany's mark by the counterfeiting vendors themselves, or whether eBay bears

19

liability for false advertising. But it is not a basis for a claim of direct trademark infringement against eBay, especially inasmuch as it is undisputed that eBay promptly removed all listings that Tiffany challenged as counterfeit and took affirmative steps to identify and remove illegitimate Tiffany goods. To impose liability because eBay cannot guarantee the genuineness of all of the purported Tiffany products offered on its website would unduly inhibit the lawful resale of genuine Tiffany goods.

We conclude that eBay's use of Tiffany's mark in the described manner did not constitute direct trademark infringement.

## II. Contributory Trademark Infringement

The more difficult issue, and the one that the parties have properly focused our attention on, is whether eBay is liable for contributory trademark infringement -- i.e., for culpably facilitating the infringing conduct of the counterfeiting vendors. Acknowledging the paucity of case law to guide us, we conclude that the district court correctly granted judgment on this issue in favor of eBay.

### A. Principles

Contributory trademark infringement is a judicially created doctrine that derives from the common law of torts. See, e.g., Hard Rock Café Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1148 (7th Cir. 1992); cf. Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005)

20

("[T]hese doctrines of secondary liability emerged from common law principles and are well established in the law.") (citations omitted). The Supreme Court most recently dealt with the subject in <u>Inwood Laboratories, Inc. v. Ives Laboratories, Inc.</u>, 456 U.S. 844 (1982). There, the plaintiff, Ives, asserted that several drug manufacturers had induced pharmacists to mislabel a drug the defendants produced to pass it off as Ives'. See <u>id.</u> at 847-50. According to the Court, "if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit." <u>Id.</u> at 854.[8] The

---

[8] The Supreme Court cited two cases in support of this proposition: <u>William R. Warner & Co. v. Eli Lilly & Co.</u>, 265 U.S. 526 (1924), and <u>Coca-Cola Co. v. Snow Crest Beverages, Inc.</u>, 64 F. Supp. 980 (D. Mass. 1946) (Wyzanski, <u>J.</u>), <u>aff'd</u>, 162 F.2d 280 (1st Cir.), <u>cert. denied</u>, 332 U.S. 809 (1947).

Like <u>Inwood</u>, <u>Eli Lilly</u> involved an allegation by a plaintiff drug manufacturer that a defendant drug manufacturer had intentionally induced distributors to pass off the defendant's drug to purchasers as the plaintiff's. 265 U.S. at 529-30. The Supreme Court granted the plaintiff's request for an injunction, stating that "[o]ne who induces another to commit a fraud and furnishes the means of consummating it is equally guilty and liable for the injury." <u>Id.</u> at 530-31.

In <u>Snow Crest</u>, the Coca-Cola Company claimed that a rival soft drink maker had infringed Coca-Cola's mark because bars purchasing the rival soft drink had substituted it for Coca-Cola when patrons requested a "rum (or whiskey) and Coca-Cola." 64 F. Supp. at 982, 987. Judge Wyzanski entered judgment in favor of the defendant primarily because there was insufficient evidence of such illicit substitutions taking place. <u>Id.</u> at 990. In doing so, the court stated that "[b]efore he can himself be held as a wrongdoer o[r] contributory infringer one who supplies another with the instruments by which that other commits a tort, must be shown to have knowledge that the other will or can

21

Court ultimately decided to remand the case to the Court of Appeals after concluding it had improperly rejected factual findings of the district court favoring the defendant manufacturers. Id. at 857-59.

Inwood's test for contributory trademark infringement applies on its face to manufacturers and distributors of goods. Courts have, however, extended the test to providers of services.

The Seventh Circuit applied Inwood to a lawsuit against the owner of a swap meet, or "flea market," whose vendors were alleged to have sold infringing Hard Rock Café T-shirts. See Hard Rock Café, 955 F.2d at 1148-49. The court "treated trademark infringement as a species of tort," id. at 1148, and analogized the swap meet owner to a landlord or licensor, on whom the common law "imposes the same duty . . . [as Inwood] impose[s] on manufacturers and distributors," id. at 1149; see also Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259 (9th Cir. 1996) (adopting Hard Rock Café's reasoning and applying Inwood to a swap meet owner).

Speaking more generally, the Ninth Circuit concluded that Inwood's test for contributory trademark infringement applies to a service provider if he or she exercises sufficient control over the infringing conduct. Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 984 (9th Cir. 1999); see

reasonably be expected to commit a tort with the supplied instrument." Id. at 989.

22

also id. ("Direct control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark permits the expansion of Inwood Lab.'s 'supplies a product' requirement for contributory infringement.").

We have apparently addressed contributory trademark infringement in only two related decisions, see Polymer Tech. Corp. v. Mimran, 975 F.2d 58, 64 (2d Cir. 1992) ("Polymer I"); Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 81 (2d Cir. 1994) ("Polymer II"), and even then in little detail. Citing Inwood, we said that "[a] distributor who intentionally induces another to infringe a trademark, or continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, is contributorially liable for any injury." Polymer I, 975 F.2d at 64.

The limited case law leaves the law of contributory trademark infringement ill-defined. Although we are not the first court to consider the application of Inwood to the Internet, see, e.g., Lockheed, 194 F.3d 980, supra (Internet domain name registrar), we are apparently the first to consider its application to an online marketplace.[8]

---

[8] European courts have done so. A Belgian court declined to hold eBay liable for counterfeit cosmetic products sold through its website. See Lancôme v. eBay, Brussels Commercial Court (Aug. 12, 2008), Docket No. A/07/06032. French courts, by contrast, have concluded that eBay violated applicable trademark laws. See, e.g., S.A. Louis Vuitton Malletier v. eBay, Inc., Tribunal de Commerce de Paris, Premiere Chambre B. (Paris Commercial Court), Case No. 200677799 (June 30, 2008); Hermes v. eBay, Troyes High Court (June 4, 2008), Docket No. 06/0264; see also Max Colchester, "EBay to Pay Damages To Unit of LVMH," The Wall Street Journal, Feb. 12, 2010,

## B. Discussion

### 1. Does Inwood Apply?

In the district court, the parties disputed whether eBay was subject to the Inwood test. See Tiffany, 576 F. Supp. 2d at 504. eBay argued that it was not because it supplies a service while Inwood governs only manufacturers and distributors of products. Id. The district court rejected that distinction. It adopted instead the reasoning of the Ninth Circuit in Lockheed to conclude that Inwood applies to a service provider who exercises sufficient control over the means of the infringing conduct. Id. at 505-06. Looking "to the extent of the control exercised by eBay over its sellers' means of infringement," the district court concluded that Inwood applied in light of the "significant control" eBay retained over the transactions and listings facilitated by and conducted through its website. Id. at 505-07.

---

http://online.wsj.com/article_email/SB10001424052748704337004575059523018541764-lMyQjAxMTAwMDEwMjExNDIyWj.html (last visited Mar. 1, 2010) ("A Paris court Thursday ordered eBay to pay Louis Vuitton €200,000 ($275,000) in damages and to stop paying search engines to direct certain key words to the eBay site."); see generally, Valerie Walsh Johnson & Laura P. Merritt, TIFFANY v. EBAY: A Case of Genuine Disparity in International Court Rulings on Counterfeit Products, 1 No. 2 Landslide 22 (2008) (surveying decisions by European courts in trademark infringement cases brought against eBay).

24

On appeal, eBay no longer maintains that it is not subject to Inwood.[9] We therefore assume without deciding that Inwood's test for contributory trademark infringement governs.

### 2. Is eBay Liable Under Inwood?

The question that remains, then, is whether eBay is liable under the Inwood test on the basis of the services it provided to those who used its website to sell counterfeit Tiffany products. As noted, when applying Inwood to service providers, there are two ways in which a defendant may become contributorially liable for the infringing conduct of another: first, if the service provider "intentionally induces another to infringe a trademark," and second, if the service provider "continues to supply its [service] to one whom it knows or has reason to know is engaging in trademark infringement." Inwood, 456 U.S. at 854. Tiffany does not argue that eBay induced the sale of counterfeit Tiffany goods on its website -- the circumstances addressed by the first part of the Inwood test. It argues instead, under the second part of the Inwood test, that eBay continued to supply its services to the sellers of

---

[9] Amici do so claim. See Electronic Frontier Foundation et al. Amici Br. 6 (arguing that Inwood should "not govern where, as here, the alleged contributory infringer has no direct means to establish whether there is any act of direct infringement in the first place"). We decline to consider this argument. "Although an amicus brief can be helpful in elaborating issues properly presented by the parties, it is normally not a method for injecting new issues into an appeal, at least in cases where the parties are competently represented by counsel." Universal City Studios, Inc. v. Corley, 273 F.3d 429, 445 (2d Cir. 2001).

counterfeit Tiffany goods while knowing or having reason to know that such sellers were infringing Tiffany's mark.

The district court rejected this argument. First, it concluded that to the extent the NOCIs that Tiffany submitted gave eBay reason to know that particular listings were for counterfeit goods, eBay did not continue to carry those listings once it learned that they were specious. Tiffany, 576 F. Supp. 2d at 515-16. The court found that eBay's practice was promptly to remove the challenged listing from its website, warn sellers and buyers, cancel fees it earned from that listing, and direct buyers not to consummate the sale of the disputed item. Id. at 516. The court therefore declined to hold eBay contributorially liable for the infringing conduct of those sellers. Id. at 518. On appeal, Tiffany does not appear to challenge this conclusion. In any event, we agree with the district court that no liability arises with respect to those terminated listings.

Tiffany disagrees vigorously, however, with the district court's further determination that eBay lacked sufficient knowledge of trademark infringement by sellers behind other, non-terminated listings to provide a basis for Inwood liability. Tiffany argued in the district court that eBay knew, or at least had reason to know, that counterfeit Tiffany goods were being sold ubiquitously on its website. Id. at 507-08. As evidence, it pointed to, inter alia, the demand letters it sent to eBay in 2003 and 2004, the results of its Buying Programs that it shared with eBay, the thousands of NOCIs it filed with eBay

26

alleging its good faith belief that certain listings were counterfeit, and the various complaints eBay received from buyers claiming that they had purchased one or more counterfeit Tiffany items through eBay's website. Id. at 507. Tiffany argued that taken together, this evidence established eBay's knowledge of the widespread sale of counterfeit Tiffany products on its website. Tiffany urged that eBay be held contributorially liable on the basis that despite that knowledge, it continued to make its services available to infringing sellers. Id. at 507-08.

The district court rejected this argument. It acknowledged that "[t]he evidence produced at trial demonstrated that eBay had generalized notice that some portion of the Tiffany goods sold on its website might be counterfeit." Id. at 507 (emphasis in original). The court characterized the issue before it as "whether eBay's generalized knowledge of trademark infringement on its website was sufficient to meet the 'knowledge or reason to know' prong of the Inwood test." Id. at 508 (emphasis in original). eBay had argued that "such generalized knowledge is insufficient, and that the law demands more specific knowledge of individual instances of infringement and infringing sellers before imposing a burden upon eBay to remedy the problem." Id.

The district court concluded that "while eBay clearly possessed general knowledge as to counterfeiting on its website, such generalized knowledge is insufficient under the Inwood test to impose upon eBay an affirmative duty to remedy the problem."

27

Id. at 508. The court reasoned that Inwood's language explicitly imposes contributory liability on a defendant who "continues to supply its product [-- in eBay's case, its service --] to one whom it knows or has reason to know is engaging in trademark infringement." Id. at 508 (emphasis in original). The court also noted that plaintiffs "bear a high burden in establishing 'knowledge' of contributory infringement," and that courts have

> been reluctant to extend contributory trademark liability to defendants where there is some uncertainty as to the extent or the nature of the infringement. In Inwood, Justice White emphasized in his concurring opinion that a defendant is not "require[d] . . . to refuse to sell to dealers who merely might pass off its goods."

Id. at 508-09 (quoting Inwood, 456 U.S. at 861 (White, J., concurring) (emphasis and alteration in original).[10]

Accordingly, the district court concluded that for Tiffany to establish eBay's contributory liability, Tiffany would have to show that eBay "knew or had reason to know of specific instances of actual infringement" beyond those that it addressed upon learning of them. Id. at 510. Tiffany failed to make such a showing.

On appeal, Tiffany argues that the distinction drawn by the district court between eBay's general knowledge of the sale of counterfeit Tiffany goods through its website, and its specific knowledge as to which particular sellers were making

---

[10] The district court found the cases Tiffany relied on for the proposition that general knowledge of counterfeiting suffices to trigger liability to be inapposite. Id. at 510.

such sales, is a "false" one not required by the law. Appellants' Br. 28. Tiffany posits that the only relevant question is "whether all of the knowledge, when taken together, puts [eBay] on notice that there is a substantial problem of trademark infringement. If so and if it fails to act, [eBay] is liable for contributory trademark infringement." Id. at 29.

We agree with the district court. For contributory trademark infringement liability to lie, a service provider must have more than a general knowledge or reason to know that its service is being used to sell counterfeit goods. Some contemporary knowledge of which particular listings are infringing or will infringe in the future is necessary.

We are not persuaded by Tiffany's proposed interpretation of Inwood. Tiffany understands the "lesson of Inwood" to be that an action for contributory trademark infringement lies where "the evidence [of infringing activity] – direct or circumstantial, taken as a whole – . . . provide[s] a basis for finding that the defendant knew or should have known that its product or service was being used to further illegal counterfeiting activity." Appellants' Br. 30. We think that Tiffany reads Inwood too broadly. Although the Inwood Court articulated a "knows or has reason to know" prong in setting out its contributory liability test, the Court explicitly declined to apply that prong to the facts then before it. See Inwood, 456 U.S. at 852 n.12 ("The District Court also found that the petitioners did not continue to provide drugs to retailers whom

29

they knew or should have known were engaging in trademark infringement. The Court of Appeals did not discuss that finding, and we do not address it.") (internal citation omitted). The Court applied only the inducement prong of the test. See id. at 852-59.

We therefore do not think that Inwood establishes the contours of the "knows or has reason to know" prong. Insofar as it speaks to the issue, though, the particular phrasing that the Court used -- that a defendant will be liable if it "continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement," id. at 854 (emphasis added) -- supports the district court's interpretation of Inwood, not Tiffany's.

We find helpful the Supreme Court's discussion of Inwood in a subsequent copyright case, Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417 (1984). There, defendant Sony manufactured and sold home video tape recorders. Id. at 419. Plaintiffs Universal Studios and Walt Disney Productions held copyrights on various television programs that individual television-viewers had taped using the defendant's recorders. Id. at 419-20. The plaintiffs contended that this use of the recorders constituted copyright infringement for which the defendants should be held contributorily liable. Id. In ruling for the defendants, the Court discussed Inwood and the differences between contributory liability in trademark versus copyright law.

30

If *Inwood*'s <u>narrow standard</u> for contributory trademark infringement governed here, [the plaintiffs'] claim of contributory infringement would merit little discussion. Sony certainly does not 'intentionally induce[]' its customers to make infringing uses of [the plaintiffs'] copyrights, nor does it supply its products to <u>identified individuals known by it</u> to be engaging in continuing infringement of [the plaintiffs'] copyrights.

*Id.* at 439 n.19 (quoting *Inwood*, 456 U.S. at 855; emphases added).

Thus, the Court suggested, had the *Inwood* standard applied in *Sony*, the fact that Sony might have known that some portion of the purchasers of its product used it to violate the copyrights of others would not have provided a sufficient basis for contributory liability. *Inwood*'s "narrow standard" would have required knowledge by Sony of "identified individuals" engaging in infringing conduct. Tiffany's reading of *Inwood* is therefore contrary to the interpretation of that case set forth in *Sony*.

Although the Supreme Court's observations in *Sony*, a copyright case, about the "knows or has reason to know" prong of the contributory trademark infringement test set forth in *Inwood* were dicta, they constitute the only discussion of that prong by the Supreme Court of which we are aware. We think them to be persuasive authority here.[11]

---

[11]  In discussing *Inwood*'s "knows or has reason to know" prong of the contributory infringement test, *Sony* refers to a defendant's knowledge, but not to its constructive knowledge, of a third party's infringing conduct. *Sony*, 464 U.S. at 439 n.19. We do not take the omission as altering the test *Inwood*

31

Applying Sony's interpretation of Inwood, we agree with the district court that "Tiffany's general allegations of counterfeiting failed to provide eBay with the knowledge required under Inwood." Tiffany, 576 F. Supp. 2d at 511. Tiffany's demand letters and Buying Programs did not identify particular sellers who Tiffany thought were then offering or would offer counterfeit goods. Id. at 511-13.[12] And although the NOCIs and buyer complaints gave eBay reason to know that certain sellers had been selling counterfeits, those sellers' listings were removed and repeat offenders were suspended from the eBay site. Thus Tiffany failed to demonstrate that eBay was supplying its service to individuals who it knew or had reason to know were selling counterfeit Tiffany goods.

Accordingly, we affirm the judgment of the district court insofar as it holds that eBay is not contributorially liable for trademark infringement.

### 3. Willful Blindness.

Tiffany and its amici express their concern that if eBay is not held liable except when specific counterfeit listings are brought to its attention, eBay will have no incentive to root out such listings from its website. They argue that this will effectively require Tiffany and similarly situated retailers to police eBay's website -- and many others like it -- "24 hours a

articulates.
[12] The demand letters did say that eBay should presume that sellers offering five or more Tiffany goods were selling counterfeits, id. at 511, but we agree with the district court that this presumption was factually unfounded, id. at 511-12.

day, and 365 days a year."  Council of Fashion Designers of America, Inc. Amicus Br. 5.  They urge that this is a burden that most mark holders cannot afford to bear.

First, and most obviously, we are interpreting the law and applying it to the facts of this case.  We could not, even if we thought it wise, revise the existing law in order to better serve one party's interests at the expense of the other's.

But we are also disposed to think, and the record suggests, that private market forces give eBay and those operating similar businesses a strong incentive to minimize the counterfeit goods sold on their websites.  eBay received many complaints from users claiming to have been duped into buying counterfeit Tiffany products sold on eBay.  Tiffany, 576 F. Supp. 2d at 487.  The risk of alienating these users gives eBay a reason to identify and remove counterfeit listings.[13]  Indeed, it has spent millions of dollars in that effort.

Moreover, we agree with the district court that if eBay had reason to suspect that counterfeit Tiffany goods were being sold through its website, and intentionally shielded itself from discovering the offending listings or the identity of the sellers behind them, eBay might very well have been charged with knowledge of those sales sufficient to satisfy Inwood's "knows or has reason to know" prong.  Tiffany, 576 F. Supp. 2d at 513-14.

---

[13]  At the same time, we appreciate the argument that insofar as eBay receives revenue from undetected counterfeit listings and sales through the fees it charges, it has an incentive to permit such listings and sales to continue.

A service provider is not, we think, permitted willful blindness. When it has reason to suspect that users of its service are infringing a protected mark, it may not shield itself from learning of the particular infringing transactions by looking the other way. See, e.g., Hard Rock Café, 955 F.2d at 1149 ("To be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate."); Fonovisa, 76 F.3d at 265 (applying Hard Rock Café's reasoning to conclude that "a swap meet can not disregard its vendors' blatant trademark infringements with impunity").[14] In the words of the Seventh Circuit, "willful blindness is equivalent to actual knowledge for purposes of the Lanham Act." Hard Rock Café, 955 F.2d at 1149.[15]

---

[14] To be clear, a service provider is not contributorially liable under Inwood merely for failing to anticipate that others would use its service to infringe a protected mark. Inwood, 456 U.S. at 854 n.13 (stating that for contributory liability to lie, a defendant must do more than "reasonably anticipate" a third party's infringing conduct (internal quotation marks omitted)). But contributory liability may arise where a defendant is (as was eBay here) made aware that there was infringement on its site but (unlike eBay here) ignored that fact.

[15] The principle that willful blindness is tantamount to knowledge is hardly novel. See, e.g. Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 659, 692 (1989) (concluding in public-official libel case that "purposeful avoidance of the truth" is equivalent to "knowledge that [a statement] was false or [was made] with reckless disregard of whether it was false" (internal quotation marks omitted)); United States v. Khorozian, 333 F.3d 498, 504 (3d Cir. 2003) (acting with willful blindness satisfies the intent requirement of the federal bank fraud statute); Friedman v. Comm'r, 53 F.3d 523, 525 (2d Cir. 1995) ("The 'innocent spouse' exemption [from the rule that married couples who file a joint tax return are jointly and severally liable for any tax liability found] was not designed to protect willful blindness or to encourage the deliberate cultivation of ignorance."); Mattingly v. United States, 924 F.2d 785, 792 (8th Cir. 1991) (concluding in civil tax fraud case that "the element of knowledge may be inferred from deliberate acts amounting to willful blindness to the existence of fact or acts constituting

eBay appears to concede that it knew as a general matter that counterfeit Tiffany products were listed and sold through its website. Tiffany, 576 F. Supp. 2d at 514. Without more, however, this knowledge is insufficient to trigger liability under Inwood. The district court found, after careful consideration, that eBay was not willfully blind to the counterfeit sales. Id. at 513. That finding is not clearly erroneous.[16] eBay did not ignore the information it was given about counterfeit sales on its website.

---

conscious purpose to avoid enlightenment."); Morrow Shoe Mfg. Co. v. New England Shoe Co., 57 F. 685, 694 (7th Cir. 1893) ("The mind cannot well avoid the conclusion that if they did not know of the fraudulent purposes of Davis it was because they were willfully blind. Such facility of belief, it has been well said, invites fraud, and may justly be suspected of being its accomplice."); State Street Trust Co. v. Ernst, 278 N.Y. 104, 112, 15 N.E.2d 416, 419 (1938) ("[H]eedlessness and reckless disregard of consequence [by an accountant] may take the place of deliberate intention.").

[16] Tiffany's reliance on the "flea market" cases, Hard Rock Café and Fonovisa, is unavailing. eBay's efforts to combat counterfeiting far exceeded the efforts made by the defendants in those cases. See Hard Rock Café, 955 F.2d at 1146 (defendant did not investigate any of the seizures of counterfeit products at its swap meet, even though it knew they had occurred); Fonovisa, 76 F.3d at 265 (concluding that plaintiff stated a claim for contributory trademark infringement based on allegation that swap meet "disregard[ed] its vendors' blatant trademark infringements with impunity"). Moreover, neither case concluded that the defendant was willfully blind. The court in Hard Rock Café remanded so that the district court could apply the correct definition of "willful blindness," 955 F.2d at 1149, and the court in Fonovisa merely sustained the plaintiff's complaint against a motion to dismiss, 76 F.3d at 260-61, 265.

III. Trademark Dilution

A.   Principles

Federal law allows the owner of a "famous mark" to enjoin a person from using "a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark."  15 U.S.C. § 1125(c)(1).

"Dilution by blurring" is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."  Id. § 1125(c)(2)(B).  It can occur "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."  Id. § 1125(c)(1).  "Some classic examples of blurring include 'hypothetical anomalies as Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth.'"  Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 105 (2d Cir. 2009) (quoting Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1031 (2d Cir. 1989)).  It is not a question of confusion; few consumers would likely confuse the source of a Kodak camera with the source of a "Kodak" piano.  Dilution by blurring refers instead to "'the whittling away of [the] established trademark's selling power and value through its unauthorized use by others.'"  Id. (quoting Mead Data Cent., 875 F.2d at 1031).

Federal law identifies a non-exhaustive list of six factors that courts "may consider" when determining whether a mark is likely to cause dilution by blurring.  These are: (1)

36

"[t]he degree of similarity between the mark or trade name and the famous mark";[17] (2) "[t]he degree of inherent or acquired distinctiveness of the famous mark"; (3) "[t]he extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark"; (4) "[t]he degree of recognition of the famous mark"; (5) "[w]hether the user of the mark or trade name intended to create an association with the famous mark"; and (6) "[a]ny actual association between the mark or trade name and the famous mark." 15 U.S.C. § 1125(c)(2)(B)(i-vi).

In contrast to dilution by blurring, "dilution by tarnishment" is an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). This "generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." Deere & Co. v. MTD Prods., Inc., 41 F.3d 39, 43 (2d Cir. 1994).

New York State law also "provide[s] for protection against both dilution by blurring and tarnishment." Starbucks Corp., 588 F.3d at 114; see N.Y. Gen. Bus. Law § 360-l. The

---

[17] We have recently explained that under the Trademark Dilution Revision Act of 2006 ("TDRA"), Pub. L. No. 109-312, 120 Stat. 1730, 1731 (Oct. 6, 2006), the similarity between the famous mark and the allegedly blurring mark need not be "substantial" in order for the dilution by blurring claim to succeed. See Starbucks Corp., 588 F.3d at 107-09. The district court concluded that the TDRA governs Tiffany's claim. See Tiffany, 576 F. Supp. 2d at 522-23. We agree and note that Tiffany does not dispute this conclusion on appeal.

37

state law is not identical to the federal one, however. New York "does not[, for example,] require a mark to be 'famous' for protection against dilution to apply." Starbucks Corp., 588 F.3d at 114. Nor are the factors used to determine whether blurring has occurred the same. "Most important to the distinction here, New York law does not permit a dilution claim unless the marks are 'substantially' similar." Id.

B.   Discussion

The district court rejected Tiffany's dilution by blurring claim on the ground that "eBay never used the TIFFANY Marks in an effort to create an association with its own product, but instead, used the marks directly to advertise and identify the availability of authentic Tiffany merchandise on the eBay website." Tiffany, 576 F. Supp. 2d at 524. The court concluded that "just as the dilution by blurring claim fails because eBay has never used the [Tiffany] Marks to refer to eBay's own product, the dilution by tarnishment claim also fails." Id. at 525.

We agree. There is no second mark or product at issue here to blur with or to tarnish "Tiffany."

Tiffany argues that counterfeiting dilutes the value of its product. Perhaps. But insofar as eBay did not itself sell the goods at issue, it did not itself engage in dilution.

Tiffany argued unsuccessfully to the district court that eBay was liable for contributory dilution. Id. at 526. Assuming without deciding that such a cause of action exists, the

38

court concluded that the claim would fail for the same reasons Tiffany's contributory trademark infringement claim failed. Id. Tiffany does not contest this conclusion on appeal. We therefore do not address it. See Palmieri v. Allstate Ins. Co., 445 F.3d 179 (2d Cir. 2006) (issues not raised on appeal are treated as waived).

IV. False Advertising

Finally, Tiffany claims that eBay engaged in false advertising in violation of federal law.

A. Principles

Section 43(a) of the Lanham Act prohibits any person from, "in commercial advertising or promotion, misrepresent[ing] the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). A claim of false advertising may be based on at least one of two theories: "that the challenged advertisement is literally false, i.e., false on its face," or "that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers." Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007).

In either case, the "injuries redressed in false advertising cases are the result of public deception." Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp., 960 F.2d 294, 298 (2d Cir. 1992) ("Merck"). And "[u]nder either theory, the plaintiff must also demonstrate that the false or

39

misleading representation involved an inherent or material quality of the product."  Time Warner Cable, 497 F.3d at 153 n.3.[18]

Where an advertising claim is literally false, "the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public."  McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir. 1991) (internal quotation marks omitted).  To succeed in a likelihood-of-confusion case where the statement at issue is not literally false, however, a plaintiff "must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers," and must "demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement."  Merck, 960 F.2d at 297, 298; Time Warner Cable, 497 F.3d at 153 ("[W]hereas plaintiffs seeking to establish a literal falsehood must generally show the substance of what is conveyed, . . . a district court must rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false message." (internal quotation marks omitted and

_____

[18] We recently adopted "the 'false by necessary implication' doctrine," under which "a district court evaluating whether an advertisement is literally false 'must analyze the message conveyed in full context.'"  Time Warner Cable, 497 F.3d at 158; cf. S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001) ("In considering a false-advertising claim, [f]undamental to any task of interpretation is the principle that text must yield to context." (quoting Avis Rent A Car Sys., Inc. v. Hertz Corp., 782 F.2d 381, 385 (2d Cir. 1986) (internal quotation marks omitted)).

40

emphasis and alterations in original)).

B.   Discussion

eBay advertised the sale of Tiffany goods on its website in various ways.  Among other things, eBay provided hyperlinks to "Tiffany," "Tiffany & Co. under $150," "Tiffany & Co.," "Tiffany Rings," and "Tiffany & Co. under $50."  Pl.'s Exs. 290, 392, 1064, 1065.  eBay also purchased advertising space on search engines, in some instances providing a link to eBay's site and exhorting the reader to "Find **tiffany** items at low prices." Pl.'s Ex. 1065 (bold face type in original).  Yet the district court found, and eBay does not deny, that "eBay certainly had generalized knowledge that Tiffany products sold on eBay were often counterfeit."  Tiffany, 576 F. Supp. 2d at 520-21.  Tiffany argues that because eBay advertised the sale of Tiffany goods on its website, and because many of those goods were in fact counterfeit, eBay should be liable for false advertising.

The district court rejected this argument.  Id. at 519-21.  The court first concluded that the advertisements at issue were not literally false "[b]ecause authentic Tiffany merchandise is sold on eBay's website," even if counterfeit Tiffany products are sold there, too.  Id. at 520.

The court then considered whether the advertisements, though not literally false, were nonetheless misleading.  It concluded they were not for three reasons.  First, the court found that eBay's use of Tiffany's mark in its advertising was "protected, nominative fair use."  Id.  Second, the court found

41

that "Tiffany has not proven that eBay had specific knowledge as to the illicit nature of individual listings," implying that such knowledge would be necessary to sustain a false advertising claim.  Id. at 521.  Finally, the court reasoned that "to the extent that the advertising was false, the falsity was the responsibility of third party sellers, not eBay."  Id.

We agree with the district court that eBay's advertisements were not literally false inasmuch as genuine Tiffany merchandise was offered for sale through eBay's website.  But we are unable to affirm on the record before us the district court's further conclusion that eBay's advertisements were not "likely to mislead or confuse consumers."  Time Warner Cable, 497 F.3d at 153.

As noted, to evaluate Tiffany's claim that eBay's advertisements misled consumers, a court must determine whether extrinsic evidence indicates that the challenged advertisements were misleading or confusing.  The reasons the district court gave for rejecting Tiffany's claim do not seem to reflect this determination, though.  The court's first rationale was that eBay's advertisements were nominative fair use of Tiffany's mark.

But, even if that is so, it does not follow that eBay did not use the mark in a misleading advertisement.  It may, after all, constitute fair use for Brand X Coffee to use the trademark of its competitor, Brand Y Coffee, in an advertisement stating that "In a blind taste test, 9 out of 10 New Yorkers said they preferred Brand X Coffee to Brand Y Coffee."  But if 9 out

42

of 10 New Yorkers in a statistically significant sample did <u>not</u> say they preferred X to Y, or if they were paid to say that they did, then the advertisement would nonetheless be literally false in the first example, or misleading in the second.

There is a similar difficulty with the district court's reliance on the fact that eBay did not know which particular listings on its website offered counterfeit Tiffany goods. That is relevant, as we have said, to whether eBay committed contributory trademark infringement. But it sheds little light on whether the advertisements were misleading insofar as they implied the genuineness of Tiffany goods on eBay's site.

Finally, the district court reasoned that if eBay's advertisements were misleading, that was only because the sellers of counterfeits made them so by offering inauthentic Tiffany goods. Again, this consideration is relevant to Tiffany's direct infringement claim, but less relevant, if relevant at all, here. It is true that eBay did not itself sell counterfeit Tiffany goods; only the fraudulent vendors did, and that is in part why we conclude that eBay did not infringe Tiffany's mark. But eBay did affirmatively advertise the goods sold through its site as Tiffany merchandise. The law requires us to hold eBay accountable for the words that it chose insofar as they misled or confused consumers.

eBay and its amici warn of the deterrent effect that will grip online advertisers who are unable to confirm the authenticity of all of the goods they advertise for sale. <u>See,</u>

43

e.g., Yahoo! Inc. Amicus Br. 15; Electronic Frontier Foundation et al. Amicus Br. 18-19. We rather doubt that the consequences will be so dire. An online advertiser such as eBay need not cease its advertisements for a kind of goods only because it knows that not all of those goods are authentic. A disclaimer might suffice. But the law prohibits an advertisement that implies that all of the goods offered on a defendant's website are genuine when in fact, as here, a sizeable proportion of them are not.

Rather than vacate the judgment of the district court as to Tiffany's false advertising claim, we think it prudent to remand the cause so that the district court, with its greater familiarity with the evidence, can reconsider the claim in light of what we have said. The case is therefore remanded pursuant to United States v. Jacobson, 15 F.3d 19 (2d Cir. 1994), for further proceedings for the limited purpose of the district court's re-examination of the false advertising claim in accordance with this opinion. We retain jurisdiction so that any of the parties may seek appellate review by notifying the Clerk of the Court within thirty days of entry of the district court's judgment on remand. See, e.g., Galviz Zapata v. United States, 431 F.3d 395, 399 (2d Cir. 2005). Such notification will not require the filing of a new notice of appeal. Id. If notification occurs, the matter will be referred automatically to this panel for disposition.

44

If circumstances obviate the need for the case to return to this Court, the parties shall promptly notify the Clerk of the Court.  Id.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of the district court with respect to the claims of trademark infringement and dilution.  Employing a <u>Jacobson</u> remand, we return the cause to the district court for further proceedings with respect to Tiffany's false advertising claim.